YALE *v.* J. L. HUDSON CO.

Master and Servant—Procurement of Discharge by Third Person—Proximate Cause—Evidence.

In action wherein plaintiff claimed defendant corporation and its credit manager through whom plaintiff and wife had purchased clothing and other merchandise had procured plaintiff's discharge from employment as assistant production manager of a foreign plant of motor corporation employer, while testimony presented question of fact as to whether defendants had violated their credit arrangements with plaintiff, it did not support claim that such violation caused plaintiff's discharge; hence plaintiff, as a matter of law, was not entitled to recover.

Appeal from Wayne; Marschner (Adolph F.), J. Submitted April 6, 1944. (Docket No. 34, Calendar No. 42,486.) Decided May 17, 1944.

Case by Walter Sawer Yale against the J. L. Hudson Company, a Michigan corporation, and another for damages resulting from wrongfully causing his discharge as an employee of General Motors Corporation. Verdict for plaintiff. Judgment for defendant *non obstante veredicto*. Plaintiff appeals. Affirmed.

*Walter M. Nelson,* for plaintiff.

*Bernard A. Clark,* for defendants.

STARR, J. Plaintiff sues defendant J. L. Hudson Company, which conducts a department store in Detroit, and its credit manager, defendant Sales, for damages, alleging in substance that they wrongfully caused his discharge as an employee of General Motors Corporation. Upon jury trial plaintiff obtained verdict of $2,000. The trial court granted motion for judgment *non obstante veredicto* and entered judgment for defendants. Plaintiff appeals, contending that the evidence presented questions of fact for jury determination and that the trial court erred in granting defendants' motion.

Plaintiff had been employed by General Motors Corporation in Detroit for several years and in the fall of 1939 was assigned to the position of assistant production manager of its plant at Sao Paulo, Brazil, at a salary of $550 a month. There was no contract of employment between plaintiff and General Motors, but he apparently assumed that he and his family would remain in Brazil for at least three years. In preparation for the trip and prior to leaving Detroit on December 11, 1939, plaintiff and his wife purchased, on credit, from defendant Hudson Company, clothing and other merchandise in the amount of about $1,700. There is no

dispute as to the quality of the goods purchased or as to the balance plaintiff owes on the account. However, the parties are in dispute as to the terms of the credit arrangement for such purchases. Plaintiff testified regarding his interview with defendant Sales, credit manager, in part as follows:

"Mrs. Yale mentioned to him at that time that she needed all of these items, and wanted to know if our credit would be good for enough money to procure those items, and * * * he said, 'Your credit is far in excess of $2,000. * * * You just go ahead, and * * * buy anything you want and * * * let me worry about the credit.' * * *

"We told him at that time that we would endeavor to try our best to consume or pay as much as possible by June, the major portion of it by June, if we possibly could. * * *

"*Q.* Did he (Sales) state specifically how long he would allow you to pay this account?

"*A.* We told him—he did not. We said to him at that time, so he was perfectly cognizant of it, that our period of time was three years in Brazil, and that we would have to make monthly payments. * * *

"*The Court:* You mean that you were to have three or four years to pay for those goods, * * * without any indorsement?

"*A.* Yes, sir; correct.

"*Q.* And you were quite sure from his conversation that he was going to let you take three years in which to pay this up in any way that you could, is that it?

"*A.* No, I told him at that time that we would make every effort to pay that bill, as much of it as possible by June, in monthly payments. * * *

"The total amount that we paid on this indebtedness of $1,700 is somewhere in the neighborhood of $175."

Plaintiff's wife, who was present at his interview with defendant Sales, testified regarding the credit arrangement in part as follows:

"We went into Mr. Sales' office, and we told him there that Mr. Yale had been made assistant production manager in Sao Paulo, and that we wanted to know about our credit, * * * I explained to him, that I did not have the proper clothes, luggage, and the like to go. Mr. Sales told me it was perfectly all right. He had got my card out of the file. He looked at it, and told me that I could have the extent of credit to between $2,000 and $3,000. * * * Mr. Sales said, * * * 'You can have two or three years to pay it.' I explained to Mr. Sales that we would like to clean it up as soon as we could, by June or July of that year. * * * He said, 'Don't worry about it; take time as you need to.'"

Defendant Sales gave an entirely different version of the credit arrangement with plaintiff. He testified in part:

"Mr. Yale came in and said that he had had a three-year assignment with the General Motors Overseas Corporation and he was going to Brazil, and he would like to buy a quantity of merchandise * * * an unusually large amount, and how much would I give him in the way of credit. * * * He told me that he was going to get $550 a month and had other income. He didn't specify what the other income was.

"After studying the matter, I told Mr. Yale that I would let him buy up to $1,500. * * * But when he come in to make his purchase, he was to pay it down to $1,000, that I would give him a dating of 30, 60 and 90 days, which would be $250 a month, for four months. * * * In other words, $1,500 was the amount he was to buy. He was to pay it down to $1,000 and the balance in 30, 60 and 90 days extra, which is four months."

Plaintiff and his family arrived in Brazil about January 1, 1940, and he immediately began work at the General Motors plant. During the period prior to his discharge in June, 1940, plaintiff paid in instalments about $175 on the Hudson Company account. There was considerable correspondence in which the company insisted upon full payment by June 1, 1940, and in which plaintiff and his wife gave their explanations as to why they could not make full payment. In her letter of February 29, 1940, plaintiff's wife stated: "It has been arranged through General Motors that we are to send through exchange here $50 for March which is on the way and $50 for April 1st thereafter starting on the 1st of May we will send $100 direct from here to Hudsons." On April 1, 1940, plaintiff wrote the Hudson Company: "I had anticipated covering the amount owing you by June of this year but due to conditions beyond my control I must make payments of $50 per month until a near later date when these amounts can be increased." Hudson Company refused plaintiff's proposition to pay the account in monthly instalments and demanded that one-half be paid in April and the balance by June 1st. It further notified plaintiff that unless such payment was made it would place the matter before the treasurer of General Motors Corporation on May 1st. On May 7th defendant Sales wrote the overseas operations division of General Motors as follows:

"Early in November of 1939, Mr. Walter S. Yale came into our office, and stated that he was given a three-year assignment by the overseas division of the General Motors Corporation to be stationed at Sao Paulo, Brazil.  *  *  *

"We agreed to let him charge all the merchandise he needed for the trip, which we figured would be

about $1,500. There was not mention of extended payments at that time.

"During the months of November and December, Mr. and Mrs. Yale charged $1,704.90.

"We have written Mr. Yale on several occasions and did not hear from him until April 12th, at which time he sent us $100 on account, and stated in his letter that he would send us $100 each month.

"We answered his letter on April 19th telling him that his proposition was impossible of acceptance, and that we would have to have at least one-half of the account by May 1st and the balance no later than June 1st. We also told him that unless we received a check from him by May 1st, the matter would be taken up with the home office.

"We have not heard from Mr. Yale nor have we received any other payment on his account.

"We are writing you soliciting your cooperation and advice in this matter."

Upon receiving such letter from the Hudson Company, an official of the overseas operations division of General Motors wrote plaintiff in Brazil in part as follows:

"I have just received a letter from the J. L. Hudson Company, copy of which is attached, which is self-explanatory. * * *

"This matter was brought to my personal attention, rather than to the corporation or to the overseas operations, and I am appealing to you personally to immediately begin the fulfillment of the promise you made to the J. L. Hudson Company, namely, to make them a regular monthly payment of not less than $100, or if at all possible give them something more at this time and then complete the balance on that basis. * * *

"The J. L. Hudson Company also advise that they have had inquiries from one of the bonding companies which have received applications for a bond for you from the company. This, of course,

you understand, is regular procedure of the corporation. The J. L. Hudson Company found it necessary to advise the bonding company of your indebtedness to them. I do not know whether or not this will affect the issuing of the bond. * * *.

"Rather than let matters of this kind, if there are more than one, continue to worry you, why not make a definite plan for cleaning them up. I would appreciate word from you as to just what your plans will be."

In connection with his position at the Sao Paulo plant, plaintiff was required to furnish a faithful performance bond, and the surety company which bonded several thousand General Motors employees automatically furnished the required coverage. On February 19, 1940, plaintiff signed an application for bond in which he listed the Hudson Company as a creditor. The surety company later began the customary investigation to determine whether or not it wished to continue plaintiff's bond. Its representative who interviewed defendant Sales testified in part:

"I called Mr. Sales in furtherance of the investigation. * * * He told me that following the extension of $1,700 worth of credit, that they had received in April, 1940, $100, and a request that Mr. Yale be allowed to pay off the balance on the basis of $100 monthly. * * *

"I see nothing here indicating directly that that information was communicated to General Motors. * * * This investigation was left hanging in midair, we never did complete it. * * * We learned first that Mr. Yale was not with General Motors any longer, and, therefore, it did not necessitate any further work on our part, or investigation."

Defendant Sales testified regarding his interview with the representative of the surety company as follows:

"I gave Mr. Locy the details of Mr. Yale's account. When he (plaintiff) bought, what he bought, how much he bought, and what he owed and how much he paid on the account. * * * He did not ask me in substance whether the account was in a satisfactory state. * * * What conclusions he drew, I can't help. * * * I didn't say anything about any overdue. I gave him the amount that was unpaid."

Plaintiff was discharged about June 24, 1940. As above mentioned, the surety company had not completed its investigation at the time of his discharge, but it had continued his bond in full force. There is no showing that the surety company reported the results of its investigation to plaintiff's employer or that such investigation caused his discharge. The testimony does not show that plaintiff was discharged because of any information defendants Hudson Company and Sales gave to General Motors or the surety company. However, plaintiff contends that the testimony "established by reasonable inferences" that defendants wrongfully caused his discharge. In his brief he states:

"It is the claim of plaintiff that the real business of procuring his discharge was not entirely the subject of written communication between General Motors overseas division and the Hudson Company *but that it is established by reasonable inferences.*"

The conflicting testimony of plaintiff and defendant Sales clearly presented questions of fact as to the terms of the credit arrangement. However, a finding that the terms of such arrangement were as claimed by plaintiff would not alone establish liability on the part of defendants. It was necessary for plaintiff to prove not only that defendants violated their credit arrangement, but that such violation caused his discharge.

Viewed in the light most favorable to plaintiff, the testimony does not show, nor could it be reasonably inferred, that any statements, acts or doings of defendants caused General Motors to terminate plaintiff's employment. In fact, the testimony of Mr. Harrington, managing director of General Motors' plant at Sao Paulo, under whom plaintiff worked, negatives any such inference. Mr. Harrington said in part:

"*Q.* What was the reason that the plaintiff's contract with the General Motors Corporation was terminated as far as your division was concerned?

"*A.* Mr. Yale had no contract with the General Motors Corporation. He was released because of general unsuitability and lack of interest toward his work.  *  *  *

"*Q.* Did you, at any time prior to the plaintiff's leaving Brazil, ever hear of any dealings or transactions which he had with the **J. L. Hudson Company** of Detroit, Michigan?

"*A.* No.  *  *  *

"*Q.* Did the J. L. Hudson Company, in any way, shape or manner, enter into Mr. Yale's discharge or termination of his employment with the General Motors Corporation?  *  *  *

"*A.* In no way whatsoever."

Our study of the record convinces us that the evidence presented no question of fact, for jury determination, relative to defendants' having wrongfully caused plaintiff's discharge. We agree with the trial court who, in granting defendants' motion for judgment *non obstante veredicto,* said:

"There appears to be no evidence in support of the claim of the plaintiff that any act or acts on the part of the defendants in any way prevented him from procuring a bond from the Fidelity Casualty Company. The evidence establishes that the bond furnished the plaintiff was actually issued and in full force and effect and continued so until he was

dismissed from his employment; nor is there any credible proof that any information given by the defendant I. S. Sales to the General Motors Corporation, in any manner motivated the employer in issuing its order of dismissal. * * *

. "Plaintiff had no contract with General Motors Corporation, other than a month-to-month employment, and was released because of general unsuitability and lack of interest towards his work; and that no dealings and business transactions that plaintiff had with the defendant company prior to his taking his position with the General Motors Corporation, overseas division, in any way caused his discharge or deprived him of his employment, or entered into the terms of his employment."

The factual situation presented in the case of *Wilkinson* v. *Powe,* 300 Mich. 275, cited by plaintiff, distinguishes it from the case at hand.

The judgment for defendants is affirmed, with costs.

NORTH, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.